IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Charles King, individually and on behalf of a class of others similarly situated,<br><br>                Plaintiff,<br><br>vs.<br><br>Marlboro County, Fred Knight, both individually and in his official capacity as the Sheriff of Marlboro County, and Earl Hood, both individually and in his official capacity as the Warden of Marlboro County Detention Facility,<br><br>                Defendants. | Civil Action No. 6:09-1315-TLW-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This matter is before the court on the plaintiff's motion for class certification (doc. 36). The plaintiff, who is represented by counsel, brought this action "on behalf of himself and on behalf of a class of others who were strip-searched [at the Marlboro County Detention Center] after being charged with petty crimes or non-criminal offenses, to vindicate the clear and unnecessary violation of their civil rights and those of the class members they propose to represent" (comp. at 2).

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(d), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under Title 42, United States Code, Section 1983, and submit findings and recommendations to the District Court.

## FACTS PRESENTED

The Marlboro County Detention Center's ("MCDC") policy and practice requires every detainee to undress in the presence of corrections officers and submit to a delousing procedure. The intake and booking procedure is as follows: detainees are transported to the MCDC by the arresting agency in police vehicles (Hood dep. 58-59). Detainees are initially escorted into the facility by the arresting officer through a vehicular sallyport and then proceed into the intake area (*id.* 61-63; Johnson dep. 22; Irons dep. 22). Upon entry, the arresting officer provides the MCDC with charging papers, tickets, and warrants for individual detainees (Hood dep. 61-62; Johnson dep. 23; Irons dep. 22). These documents indicate the charges for which particular detainees have been arrested, though not necessarily whether those charges are felonies or misdemeanors (Hood dep. 62). Detainees are pat-searched upon admission to ensure that they are not harboring contraband (Hood dep. 62; Johnson dep. 24, 26-27; Schauer dep. 18-19; Irons dep. 23). A booking officer reviews a detainee's documents in order to ensure that their commitment is proper (Hood dep. 63; Johnson dep. 28). Next, the booking officer takes down the detainee's personal information, including contact and medical data, and inputs it into the MCDC's computer system (Hood dep. 65-66; Johnson dep. 29; Schauer dep. 20; Irons dep. 29-31). A personal property sheet is filled out for each detainee, indicating the clothes they are wearing and any property they have on them at the time they enter the facility (Hood dep. 67). Once the detainee has been booked into the system, they are fingerprinted, photographed, and placed in a holding cell to determine whether they will be taken to the magistrate's office that day or the following day in order to be arraigned (*id.* 68, 70; Johnson dep. 29-31; Irons dep. 33).

The next step in the intake process is to "change out" and finally to house the detainee (Hood dep. 69; Johnson dep. 30; Irons dep. 33). All pretrial detainees who are taken to the lock-up area to be housed are subject to the same change out procedure

2

whereby they are deloused, showered, and dressed in a jail uniform (Hood dep. 48-49, 89 (testifying that the change out process happens to "[e]very detainee that's going to be going into the secure area of the facility"); Johnson dep. 46-47, 56-58 (everyone brought into the jail goes through the changing and delousing process regardless of their charges or criminal/ institutional history); Schauer dep. 32, 35 (all detainees who are going to be housed are subject to the dress out procedure regardless of their charges); Irons dep. 50 (agrees that any detainee who enters general population must be deloused)). Detainees are taken into the shower room and provided with a green bag containing underwear, socks, towel, washcloth, and linens, as well as soap to use in the shower (Hood dep. 90; Johnson dep. 33-36; Schauer dep. 29-30). A corrections officer will instruct the detainee to get completely undressed and, once their clothing is put in the green bag, the officer "sprays [the detainee] with a delousing solution on all the hairy areas of the body…" (Hood dep. 90; Johnson dep. 5-16 ("We go into a bathroom, close the door and we have them stand across from us and we instruct them to take off their personal belongings and place them into a green bag. We spray them down with a delice..."); Schauer dep.30 (instructs detainee to remove all of their clothing so they are completely naked, then "I spray the delouse on his body [including genitals] where he's got hair"); Irons dep. 34 ("We ask them to step back, hold their arms out and we hit all the hairy parts of the body and everything and then we leave. Some people come in with hair on their backs or whatever. We spray.")).

There is no written policy that provides corrections officers with instructions on how to complete the delousing procedure (Hood dep. 94; Johnson dep. 41). Warden Hood described the procedure as follows:

> Q: And can you tell me how the delousing solution is applied?
>
> A: We put it in a spray bottle and when they go in, we spray it on all the hairy parts of the body,… squirt it down and

3

> ask them to turn around and squirt it. And on all areas of the body that's got hair, they raise their arm, spread it on their head, that type of thing.
>
> Q: And genital areas?
>
> A: Genital areas. Yes, ma'am.

(Hood dep. 53-54). Detainees are instructed to turn around during the process so that they can be sprayed "all the way around…" (*id.* 92). They lift their arms so they can be sprayed in their underarms and they are sprayed on their heads (*id.*). Officers spray the genital area with the delousing solution because it is a hairy area (*id.* 93; Johnson dep. 39-40, Irons dep. 35). Male detainees are asked to "pick up their testicles so they can spray all over" (Hood dep. 93).

Once the delousing process is completed, the detainee is provided with soap and a towel and asked to shower (*id.*). The shower is unsupervised; detainees are instructed to come out once they finish showering and dressing (*id.* 94). Warden Hood testified that despite the fact that he did not know whether the delousing solution was "automatic kill," detainees are not told to wait for a specific amount of time before showering (*id.*; Johnson dep. 41). Warden Hood acknowledged that detainees might very well shower immediately after being deloused (Hood dep. 94; Schauer dep. 32; Irons dep. 37).

The plaintiff was booked into the MCDC in July 2008 on non-felony charges related to failure to pay child support (pl. dep. 11, 17). He was brought into the facility from the Marlboro County Courthouse by the Sheriff's Department (*id.* 21-22). Upon admission, the plaintiff was patted down, and a corrections officer took his belt and whatever items were in his pockets to inventory the property (*id.* 23). The plaintiff was then transported back to the courthouse to the magistrate's office where he was arraigned (*id.* 23-24). He was then brought back to the MCDC (*id.* 24).

4

A corrections officer took the plaintiff into the shower room in the intake area. (*id.* 25). The officer told the plaintiff to remove his clothes, which the plaintiff did (*id.*). The corrections officer then sprayed the plaintiff with the delousing agent (*id.* 27).

> Q: When he squirted you with the material, did he just kind of spray you overall or how did he do it?
>
> A: No. He sprayed me and made me turn around. He sprayed all over me.
>
> Q: ... Did he make you spread your crack or lift your testicles?
>
> A: Lift my scrotum…
>
> Q: Did he make you raise your arms?
>
> A: Yes, sir.
>
> Q: … And approximately how long did that take?
>
> A: … [H]e was there probably about three minutes.

(*Id.* 29). The plaintiff then showered, got dressed, and was taken to his housing pod (*id.* 27-29).

The change out procedure that the plaintiff described undergoing and that Warden Hood testified was consistent with the MCDC policies and practices is completed for every pretrial detainee housed in the MCDC on a blanket basis, without regard to the existence of individualized reasonable suspicion (Hood dep. 142).

> Q: [S]o every detainee who's admitted to the jail is going to be changed out and deloused the way you just described?
>
> A: Yes, ma'am.
>
> Q: … And that is regardless of their charge?
>
> A: Yes, ma'am.
>
> Q: … And regardless of their criminal history.

5

A: Yes, ma'am.

Q: Regardless of their institutional history.

A: Yes, ma'am.

(*Id.* 99).

The defendants deny that the MCDC conducts blanket strip searches on pretrial detainees admitted to the facility. The plaintiff's position is that the change out and delousing procedure described above constitutes a strip search. The MCDC Policies and Procedures, Subject: Intake and Booking of Inmates (the "Intake and Booking Policy") states as follows: "Strip searches are permitted in accordance with the Strip Search Form Determining Reasonable Belief/Suspicion found in the Appendix I. Strip Searches are performed by same sex corrections officers. Corrections Officers are responsible for filling out all strip search forms in Appendix I" (pl. m. to certify class, ex. F at 19). Warden Hood testified that this form is filled out whenever a detainee is going to be strip searched (Hood dep. 102). The last page of the Intake and Booking Policy is a "decision tree" that provides instruction with respect to whether "you should strip search or not…" (*id.* 110, 112). According to the terms of the last column of the decision tree, an individual can be strip searched after arraignment, after conviction, and upon sentencing (pl. m. to certify class, ex. F ). During his deposition, Warden Hood agreed that, on its face, the decision tree provides that once a pretrial detainee has been arraigned that individual can be strip searched on that basis alone. However, Warden Hood denied that this was in fact the procedure utilized by officers at the facility. He testified that only those inmates in court-ordered detention as a result of a felony charge may be strip searched (Hood dep. 117-18).

According to Warden Hood, strip searches at the MCDC are conducted "on a random basis" such that detainees admitted on "more serious offense[s]" are strip searched (*id.* 15). Warden Hood testified that detainees charged with serious felony crimes

6

like murder may be strip searched; "we got to our tree and we look at it and see if they qualify if there's any questions" (*id.* 73). Warden Hood explained that corrections officers must get a supervisor's permission before conducting a strip search during the admissions process (*id.* 80). Two corrections officers are present when a strip search is conducted (*id.* 91). Warden Hood described the process of strip searching as follows:

> We take them into a, to the bathroom there and we ask them to pull off all their clothes. We ask them to squat, cough, hold their butt cheeks open, pick up the scrotum, open their mouth and look in their mouth, look behind the ears, hold up their arms, hold out the fingers, that type. That's a strip search.

(*Id.* 15; 83 ("Once… he's bare naked, then he asks him to squat, cough, stand up, lift up his genitals, turn around,… check his rectum,… the rear end, pulling the cheeks apart…")). Females undergo basically the same procedure and are required the lift their breasts (*id.* 84). It is the defendants' position that in order to qualify as a strip search, a corrections officer must instruct a detainee to squat and cough (*see* Johnson dep. 51-52 (instructs female detainees to lift breasts, squat, cough, turn around and bend over during a strip search, but not during change out and delousing procedure), 54 (despite spraying detainees on their genital areas as part of delousing procedure, she does not consider the dress out procedure to be a strip search: "Because you're not making them do anything. You're not telling them to squat or cough or anything. You're not seeing any of their body cavities or nothing."); Schauer dep. 28 (testifying that detainees are changed out, not strip searched, as part of admissions process), 35 (difference between strip search and change out procedures is that strip search requires detainee to squat and cough); Irons dep. 48 (only difference between strip search and change out is that during strip search they are asked to squat and cough)).

The MCDC Post Description for Intake/Booking ("Post Description") explains the duties related to the post of intake/booking. Corrections officers working in that area

7

of the MCDC are responsible for, among other things, reviewing arrest/commitment forms, searching prisoners, completing booking forms, completing medical screening forms, fingerprinting, showering, and inventorying detainees' property (pl. m. to certify class, ex. G). The Post Description states that "[e]ach inmate will be showered which includes the use of a delousing shampoo to get rid of parasites" (*id.* ¶ K). Warden Hood confirmed that while the Post Description mentions a delousing shampoo, corrections officers actually use a delousing spray on detainees (Hood dep. 120).

## **APPLICABLE LAW AND ANALYSIS**

The plaintiff requests certification of the following class:

> All persons who were placed into the custody of the Marlboro County Detention Facility after being charged with minor violations, non-criminal offenses, or misdemeanor offenses not involving drugs, weapons, contraband, or violence and were strip-searched upon their transfer and entry into the Facility. The Class period commences on March 6, 2006, and extends to the date on which the Defendants are enjoined from, or otherwise ceases from, enforcing their unconstitutional policy, practice and custom of conducting strip-searches absent reasonable suspicion. Specifically, excluded from the Class are Defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees or assignees.

(Comp. ¶ 11). The plaintiff alleges that his and the class members' rights under the Fourth Amendment of the United States Constitution have been violated. The plaintiff also alleges causes of action under the South Carolina Constitution and state statute. In their response to the motion for class certification, the defendants state, "In light of the claims presented by Plaintiff, the Defendants take no position as to certification and acknowledge a class action may be the appropriate legal mechanism to handle a litigation of this size" (def. resp. to m. to certify class 1).

A case can be certified as a class action where a plaintiff demonstrates that the threshold requirements of Federal Rule of Civil Procedure 23(a) (numerosity,

8

commonality, typicality, and adequacy of representation) are satisfied and also demonstrates that the class satisfies one of the three criteria set forth in Rule 23(b). *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 423-24 (4th Cir. 2003). Inasmuch as "certification as a class action serves important public purposes" because "[i]n addition to promoting judicial economy and efficiency, class actions also 'afford aggrieved persons a remedy if it is not economically feasible to obtain relief through the traditional framework of multiple individual damage actions,'" it is recognized that "federal courts should 'give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and ... promote judicial efficiency.'" *Id.* at 424 (citations omitted).

### *Numerosity*

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." "'[I]mpossibility of joinder is not required to meet this section of the rule .... Rather, difficulty or impracticability of joinder is sufficient.'" *Twyman v. Rockville Hous. Auth.*, 99 F.R.D. 314, 320 (D. Md. 1983) (quoting *Smith v. Baltimore & Ohio R.R.*, 473 F. Supp. 572, 590-81 (D. Md. 1979)). Here, the plaintiff contends that at least 3,400 individuals were processed at the MCDC on misdemeanors or lesser offenses during the putative class period. The defendants do not contest that numerosity exists in this matter, but they do contend that the number proposed by the plaintiff is not representative of the proposed class size. The defendants argue that the 3,400 or more individuals referenced by the plaintiff includes those individuals who were released prior to the change out procedure and who would not have been subject to the delousing at issue in this litigation. The evidence before the court is that the majority of detainees brought into the MCDC would have to go through the change out (and thus the delousing) (*see* Schauer dep. 35

(testifying that it is rare for individuals brought into the MCDC not to go through the change out)). Based upon the foregoing, the numerosity requirement is met.

***Commonality***

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." As pointed out by the plaintiff, courts routinely hold that commonality is found in strip search class actions, including in cases that are very similar factually to the instant case involving the constitutionality of delousing procedures. *See, e.g., Wilson v. County of Gloucester*, 256 F.R.D. 479 (D.N.J. 2009). In *Wilson*, the court noted that the "[p]laintiffs have put forth a legitimate question of law common to all proposed class members: whether requiring all newly admitted pretrial detainees to completely disrobe before a corrections officer - either during a supervised shower or application of delousing spray - violates federal or state law." *Id.* at 486. The court further stated, "A common question of fact also exists: what is the purpose (or purposes) of the supervised shower / delousing policies and practices?". *Id.*; *see also, e.g., Florence v. Burlington County,* No. 05-3619, 2008 WL 800970, at *7 (D.N.J. March 20, 2008); *Young v. County of Cook*, No. 06 C 552, 2007 WL 1238920, at *5 (N.D. Ill. Apr. 25, 2007) ("[c]ourts have consistently held that class actions challenging blanket strip search policies satisfy Rule 23(a)(2)'s commonality requirement"). Further, "class certification requires only a demonstration of the *existence* of evidence tending to prove or disprove an issue common to the proposed class members. The adequacy of that evidence must be tested later, on an adequate record." *Brewer v. Salyer*, No. CV F 06-1324 AWI DLB, 2009 WL 1396148, at *6 (E.D. Cal. May 18, 2009) (emphasis in original).

The plaintiff has satisfied the commonality requirement. As to the class, the heart of class members' claims is that all members of the proposed class were illegally strip searched by corrections officers at the MCDC. The County admits that all individuals

detained and housed at the MCDC were subject to the uniform policy of delousing. The plaintiff maintains that these delousings constitute strip searches, but that in any event that the delousing procedure is merely differing nomenclature for a strip search. A common question of law exists as to whether these visual inspections are unconstitutional.

*Typicality*

Rule 23(a)(3) requires that the representative plaintiff's claims be "typical" of those of the proposed class. The typicality requirement is met "if [the plaintiff's] claim arises from the same event or course of conduct that gives rise to the claims of the other class members and is based on the same legal theory." *Simpson v. Speciality Retail Concepts, Inc.*, 149 F.R.D. 94, 99 (M.D.N.C. 1993).

Here, the plaintiff's claims against the defendants are typical of the claims of the class. The plaintiff's claims arise from the same course of events, and the plaintiff must make the same - or effectively the same - arguments to prosecute his claims as would be made by all the members of the proposed class in any individual cases. *See Florence*, 2008 WL 800970, at *8 (plaintiff's claim that "the intake procedures he underwent while being admitted into the Burlington and Essex Jails amounted to an unconstitutional suspicionless strip search... is precisely the same as those of the absent putative class members because all nonindictable offenders are subjected to the same intake procedures..."); *Marriott v. County of Montgomery*, 227 F.R.D. 159, 172 (N.D. N.Y. 2005) (finding typicality even where the claims of the representative parties involved a more detailed search than other class members, because they were conducted pursuant to the same policy).

*Adequacy*

Rule 23(a)(4) requires that the class representative "fairly and adequately protect the interests of the class." This requirement is met if it appears that (1) the plaintiff's attorneys are qualified, experienced, and able to conduct the litigation; and (2) the plaintiff's interests are not antagonistic to those of other class members. *South Carolina Nat'l Bank v. Stone*, 139 F.R.D. 325, 330 (D.S.C.1991).

The defendants raise two issues with regard to this requirement. First, the defendants state they "are not convinced Plaintiff is an appropriate class representative in this claim" because he received no medical treatment as a result of the alleged constitutional violations of the defendants (def. resp. m. to certify class 2). The defendants cite no legal authority supporting their claim that the plaintiff's lack of medical treatment make him an inadequate representative. It is undisputed that the plaintiff, who was booked on non-felony charges, was required to undress in the presence of a corrections officer and was sprayed with a delousing agent as part of the admissions process. Nothing resembling a conflict with the class has been suggested. *See Brown v. Charles Schwab & Co., Inc.*, C.A. No. 2:07-CV-03852-DCN, 2009 WL 4809426, at *7 (D.S.C. Dec. 9, 2009) ("potential conflicts" do not defeat adequacy) (citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430-31 (4th Cir.2003) ("To defeat the adequacy requirement of Rule 23, a conflict 'must be more than merely speculative or hypothetical.' ... For a conflict of interest to prevent plaintiffs from meeting the requirement of Rule 23(a), that conflict 'must be fundamental. It must go to the heart of the litigation.'")).

Next, while the defendants "do not question the qualifications of Plaintiff's listed counsel," they do "question the necessity of seven attorneys in a claim that centers solely upon one policy at the detention facility" (def. resp. m. to certify class 3). However, as argued by the plaintiff, the number of the plaintiff's attorneys is not part of the relevant inquiry in determining the adequacy of representation. Here, the plaintiff's class counsel

12

have invested considerable time and resources into the prosecution of this action, and they have had extensive experience in successfully litigating various forms of class actions and other complex matters, including strip search cases (pl. m. to certify class, ex. H). Based upon the foregoing, this court is satisfied that the plaintiff and his counsel will fairly and adequately protect the interests of the class.

### *Rule 23(b)(3) Standards*

The plaintiff can demonstrate the threshold requirements of Rule 23(a) but must also demonstrate that the class satisfies one of the three criteria set forth in Rule 23(b). The plaintiff has satisfied the requirements under Rule 23(b)(3) since the common issues shared by class members predominate over individual issues, and a class action is the superior method to prosecute this action. Fed.R.Civ.P. 23(b)(3).

"In determining whether the predominance standard is met, courts focus on the issue of liability, and if the liability issue is common to the class, common questions are held to predominate over individual ones." *In re Kirschner Med.*, 139 F.R.D. 74, 80 (D. Md. 1991). As noted in one strip search case, "when the class is challenging a uniform policy," as here, "the validity of that policy predominates over individual issues." *Blihovde v. St. Croix County, Wis.*, 219 F.R.D. 607, 620 (W.D. Wis. 2003). Here, the proposed class members' claims involve the same central legal issues as to the constitutionality of Marlboro County's blanket policy of a visual inspection as part of its delousing procedure of every pretrial detainee housed at the MCDC. The legal and factual issues relating to the strip search policies in this litigation predominate over any of the plaintiff's individual issues. *See Moyle v. County of Contra Costa*, No. C-05-02324 JCS, 2007 WL 4287315, at **20-23 (N.D. Cal. Dec. 5, 2007) (predominance found despite argument that differing facts required individualized inquiry).

13

The defendants argue that any evaluation of alleged damages would need to be done on an individual basis. However, "[t]he need for individualized damage decisions in class action litigation, ... does not necessarily preclude a finding that common questions of law and fact predominate over individual issues on liability." *Jones v. Murphy*, 256 F.R.D. 519, 523 (D. Md. 2009). The court in *Jones* stated, "In certifying a class of individuals alleging they had been unlawfully strip searched at a county detention facility, another judge in this court concluded that 'resolution of the liability and damages issues within the context of a class action is far more efficient than individual prosecution of damages actions. A class action is also the fairest means to settle this controversy since it is unlikely that most class members would pursue these claims on their own.'" *Id.* at 524 (quoting *Smith v. Montgomery County, Md.*, 573 F.Supp. 604, 613 (D. Md.1983)). Furthermore, as argued by the plaintiff, this is not a case where individual issues such as causation exist. In this case, the change out and delousing procedure is applied to all detainees housed in the MCDC (*see* Hood dep. 48-49, 89 (change out procedure is completed for every pretrial detainee housed in the MCDC on a blanket basis, without regard to the existence of individualized reasonable suspicion)).

In addition to the predominance requirement, Rule 23(b)(3) provides a nonexhaustive list of matters pertinent to the court's determination that the class action device is superior to other methods of adjudication:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3)(A)-(D). Here, the proposed class has several thousand members. The alternative to certification would be possibly thousands of lawsuits (or none by class

members who individually could not take upon cases or even know their rights had allegedly been violated). *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996) ("Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation."). As argued by the plaintiff, each class member here has little interest in controlling their own lawsuit in light of the common issues, and there has been, to date, no similar case filed. Furthermore, the class action device is designed for the very situation where an individual seeks to vindicate "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997) (citation omitted). "'The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.'" *Id.* (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is recommended that the plaintiff's motion for class certification (doc. 36) be granted.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

December 23, 2010

Greenville, South Carolina

15